UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CORY W. [1],                          )
                                      )
                  Plaintiff,          )
                                      )
        v.                            )        No. 2:20-cv-00610-DLP-JPH
                                      )
KILOLO KIJAKAZI,                      )
                                      )
                  Defendant.          )

## ORDER

Plaintiff Cory W. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, the Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration.

## I.    PROCEDURAL HISTORY

On January 29, 2018, Cory filed his application for Title II DIB and Title XVI SSI benefits. (Dkt. 16-2 at 24, R. 23). Cory alleged disability based on oxygen deficiency at birth, learning disabilities, and lack of mental coordination due to

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

developmental disability. (Dkt. 16-3 at 27-28, R. 95-96). The Social Security Administration ("SSA") denied Cory's claims initially on April 3, 2018, (Dkt. 16-3 at 27-48, R. 95-116), and on reconsideration on July 2, 2018, (Dkt. 16-3 at 49-74, R. 117-42). On August 24, 2018, Cory filed a written request for a hearing, which was granted. (Dkt. 16-4 at 31-32, R. 172-73).

On November 4, 2019, Administrative Law Judge ("ALJ") Deborah M. Giesen conducted a hearing, where Cory and vocational expert Edward Pagella appeared in person. (Dkt. 16-2 at 41-70, R. 40-69). On December 23, 2019, ALJ Giesen issued an unfavorable decision finding that Cory was not disabled. (Dkt. 16-2 at 24-35, R. 23-34). Cory appealed the ALJ's decision and, on September 16, 2020, the Appeals Council denied Cory's request for review, making the ALJ's decision final. (Dkt. 16-2 at 2, R. 1). Cory now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB and SSI only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work

2

experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a).[2] The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520 (a negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act. The parallel sections – applying to disability insurance benefits and supplemental security income benefits – are verbatim and make no substantive legal distinction based on the benefit type.

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Cory is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to h[er] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The

ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

## III.  BACKGROUND

### A. Factual Background

Cory was fifty-seven years old as of his alleged onset date of July 13, 2014. (Dkt. 16-3 at 27, R. 95). He is a high school graduate. (Dkt. 16-6 at 7, R. 267). Cory has relevant past work history as a groundskeeper, housekeeper, janitor, and restaurant crew member. (Id.).

### B. ALJ Decision

In determining whether Cory qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520(a) and 416.920(a) and concluded that Cory was not disabled. (Dkt. 16-2 at 24-35, R. 23-34). At Step One, the ALJ found that Cory had not engaged in substantial gainful activity since his alleged onset date of July 13, 2014. (Id. at 27, R. 26).

At Step Two, the ALJ found that Cory has a severe medically determinable impairment of borderline intellectual functioning ("BIF") and nonsevere impairments of hypertension and hypercholesterolemia, and that Cory's dementia was a non-medically determinable impairment. (Dkt. 16-2 at 27, R. 26).

6

At Step Three, the ALJ found that Cory's impairments did not meet or medically equal the severity of one of the impairments in the Listings. (Dkt. 16-2 at 28-29, R. 27-28). In reaching this determination, the ALJ considered Listings 12.11 and 12.05. (Id.).

As to the "paragraph B" criteria, the ALJ found that Cory had moderate limitations in interacting with others and understanding, remembering, or applying information, and mild limitations in adapting or managing oneself and concentrating, persisting, or maintaining pace. (Id.).

After Step Three but before Step Four, the ALJ found that Cory had the residual functional capacity ("RFC") to perform the full range of work at all exertional levels with the following non-exertional limitations: no fast-paced, production rate type work; occasionally interacting with coworkers, but no interaction with the public; and performing simple, routine, and repetitive tasks that are learned through demonstration rather than by written instructions. (Dkt. 16-2 at 29-33, R. 28-32).

At Step Four, the ALJ concluded that Cory is unable to perform any past relevant work. (Dkt. 16-2 at 33, R. 32). At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Cory's age, education, work experience, and residual functional capacity, he was capable of performing other work. (Dkt. 16-2 at 33-34, R. 32-33). The ALJ thus concluded that Cory was not disabled. (Id. at 34-35, R. 33-34).

## IV. ANALYSIS

In support of his request for reversal, Cory challenges the ALJ's decision on a number of bases: (1) the ALJ cherry-picked evidence and failed to provide an accurate and logical bridge to support the critical findings and conclusions; (2) the ALJ impermissibly substituted her own opinion for those of medical sources; (3) the ALJ erroneously concluded that Cory's condition did not meet Listing 12.11; (4) the ALJ's residual functional capacity is not supported by substantial evidence; and (5) the ALJ's ultimate determination of no disability is unsupported by the evidence. Because these issues are intertwined and the Commissioner does not address them separately, the Court will consider most issues together. The Undersigned will begin with the Plaintiff's healthcare providers.

### A. Assessment of the Medical Opinions

First, Cory argues that the ALJ erred in her assessment of the opinions of Cory's treating physician and the state agency psychologists. (Dkt. 18 at 12-18). In response, the Commissioner asserts that the ALJ adhered to the regulations in evaluating the persuasiveness of the medical opinions. (Dkt. 21 at 14).

The ALJ considered the opinions of Cory's treating physician, Dr. Paul Esguerra; the state agency psychological consultants, Drs. Patricia Garcia and B. Randal Horton; and the consultative examiner, Dr. Houman Kiani; and found all of their opinions unpersuasive. (Dkt. 16-2 at 31-32, R. 30-31). Under the prior regulations, "more weight [was] generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and

circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 416.927(c)(2). This so called "treating physician rule," however, was eliminated for claims, such as Cory's, filed after March 27, 2017. *McFadden v. Berryhill*, 721 F. App'x 501, 505 n.1 (7th Cir. 2018). "Nonetheless, the ALJ must still provide a written explanation for [her] conclusion about the treating physician's opinion, drawing a logical bridge from the evidence to the conclusion." *Varga v. Kijakazi*, No. 3:20-cv-575-JPK, 2021 WL 5769016, at *3 (N.D. Ind. Dec. 6, 2021).

"Opinion evidence is now governed by 20 C.F.R. § 404.1520c. . . (2017)." *McFadden*, 721 F. App'x at 505 n.1. The ALJ no longer assigns "any specific evidentiary weight" to medical opinions, but rather evaluates the persuasiveness of medical opinions. 20 C.F.R. § 404.1520c. When considering the persuasiveness of any medical opinion, an ALJ must now consider the following factors: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies. *See Inman v. Saul*, No. 1:20-cv-231 DRL, 2021 WL 4079293, at *2 (N.D. Ind. Sept. 7, 2021). The most important factors are the opinion's supportability and consistency. 20 C.F.R. § 404.1520c(a). These are the factors the ALJ must explicitly discuss, whereas the ALJ need only consider the other factors. 20 C.F.R. § 404.1520c(b). Failure to adequately discuss

9

supportability and consistency requires remand. *Tammy M. v. Saul*, No. 2:20-cv-285, 2021 WL 2451907, at *7-8 (N.D. Ind. June 16, 2021).

    *1. Dr. Esguerra's Opinion*

Cory asserts that the ALJ failed to build an accurate and logical bridge in assessing his treating physician, Dr. Esguerra's, opinion. (Dkt. 18 at 12-14). Specifically, Cory contends the proffered reasons for finding Dr. Esguerra's opinion unpersuasive are not supported. (Id.). In response, the Commissioner argues that the ALJ appropriately considered Dr. Esguerra's opinion, finding it not persuasive because it was unsupported and inconsistent with the record. (Dkt. 21 at 14).

On November 7, 2019, Dr. Paul Esguerra completed a physical medical assessment for Cory. (Dkt. 16-7 at 70-73, R. 429-32). Dr. Esguerra indicated that he had seen Cory in May 2019, and Cory experienced decreased concentration, memory, ability to complete tasks, and a mental handicap, would be off task 5% of a typical workday, and struggle to complete tasks or carry out duties in a timely manner. (Dkt. 16-7 at 70-73, R. 429-32). Dr. Esguerra opined that Cory was unable to work due to his mental disability. (Id. at 70, R. 429). To support his findings, Dr. Esguerra relied on Cory's moderate to severe mental disability; his statements regarding his attempts to work and trouble completing tasks; and Cory's inability to complete tasks in a timely fashion. (Dkt. 16-7 at 71, R. 430). Without identifying any particular medical or clinical findings, Dr. Esguerra opined that Cory could occasionally reach, handle, finger, feel, and push/pull with his bilateral hands; occasionally operate foot controls with both feet; occasionally climb, balance, stoop,

kneel, crouch, and crawl; tolerate occasional humidity and wetness; would need a quiet environment; should never be exposed to unprotected heights, moving mechanical parts, operating a motor vehicle, pulmonary irritants, extreme cold and heat, or vibrations; and is not able to sort, handle, or use papers or files. (Dkt. 16-7 at 71-73, R. 430-32).

The ALJ concluded that Dr. Esguerra's opinion was unpersuasive because he had only examined Cory one time prior to completing the physical medical assessment form; Dr. Esguerra was a family practitioner and not a psychiatrist; his own treatment records did not support his physical findings; and the claimant's own activities of daily living did not support the doctor's conclusion that Cory's mental handicap would prevent his ability to work. (Dkt. 16-2 at 32, R. 31).

Turning to the ALJ's argument regarding supportability, the ALJ opined that Dr. Esquerra's normal examination findings for Cory did not support his opinion to limit Cory to sedentary work with restrictions on postural maneuvers and exposure to hazardous and pulmonary irritants. (Id.). Despite Cory's normal physical findings upon examination, Dr. Esquerra concluded that these findings were not dispositive of Cory's ability to walk, lift, and carry. The state agency consultative examiner Dr. Houman Kiana also found Cory had a normal gait, full range of motion, full strength in all extremities, normal fine fingering, normal grip strength, and normal coordination, and concluded despite these findings to impose functional limitations on Cory's ability to walk, lift and carry. (Dkt. 16-2 at 31, R. 30). Apparently neither Dr. Esquerra nor Dr. Kiana found Cory's normal findings to be dispositive, and the

11

ALJ failed to explain why she believed them to be. The ALJ must have used her own lay opinions to make this determination. This was improper. *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022) (ALJs must not stray into the forbidden territory of "playing doctor").

The ALJ also found Dr. Esquerra's opinion regarding Cory's inability to work because of his mental handicap internally inconsistent with Cory's activities of daily living, which included shopping, preparing meals, using public transportation, and caring for his personal hygiene. (Dkt. 16-2 at 32, R. 31; Dkt. 16-7 at 72-73, R. 431-32). ALJs have been consistently cautioned against placing "undue weight" on a claimant's ability to perform activities of daily living in evaluating a claimant's ability to perform work especially if that can only be done with significant limitations. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Moreover, the Seventh Circuit has denounced decisions which fail to recognize the critical differences between activities of daily living that can be performed at one's own pace and by getting help from others, and the activities in a full-time job where the person is being held to a minimum standard of performance by an employer. *Annette S. v. Saul*, No. 19 C 6518, 2021 WL 1946342, at *15 (N.D. Ill. May 14, 2021) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)).

Here, the ALJ's proffered reason for disregarding Dr. Esguerra's opinion regarding Cory's mental restrictions is unpersuasive when these functions are

placed in context with how they were performed. Cory saw Dr. Howard Wooden, a clinical psychologist, for an intellectual assessment on January 29, 2009. (Dkt. 16-7 at 3-5, R. 362-64). Dr. Wooden noted that Cory's remote memory was good as far as giving basic biographical information, and that Cory was able to remember two of three words after five minutes. (Id. at 4, R. 363). Dr. Wooden found Cory's calculational ability "somewhat limited," and his judgment and reasoning moderately impaired. (Id.). Dr. Wooden determined that Cory's full scale IQ score of 72 indicated functioning within the borderline range of intellectual ability. (Id.) Dr. Wooden opined that Cory would have some problems handling funds independently. (Id. at 5, R. 364).

On August 17, 2011, Cory presented to psychologist Dr. Paula Gardner after referral by his attorneys for a mental status examination, intelligence assessment, and memory assessment. (Dkt. 16-7 at 6-15, R. 365-74). Dr. Gardner noted that Cory reported feeling interactions with supervisors as the most stressful aspect of work because of his difficulty comprehending what they are saying to him. (Id. at 7, R. 366). Dr. Gardner observed Cory's social presentation during the evaluation appeared slow; while Cory responded to questions, his responses often indicated he did not understand what was being asked. (Id. at 7-8, R. 366-67). Dr. Gardner acknowledged Cory's history of evictions and firings. (Id. at 8, R. 367). During the appointment, Cory reported that he could not live independently because he needed supervision and reminders to bathe; however, he stated he had no problem doing

laundry or going grocery shopping, is able to cook for himself, and can manage money. (Dkt. 16-7 at 8-9, R. 367-68).

Dr. Gardner opined that Cory was functioning in the borderline range of intelligence, and that Cory's ability to sustain attention, concentration, and exert mental control is in the borderline range. (Dkt. 16-7 at 11, R. 370). When assessing Cory's memory, Dr. Gardner opined that Cory was functioning in the average range for auditory, but in the extremely low range for visual. (Id.). Dr. Gardner opined that this would "likely [] be a great disadvantage for him in all aspects of daily living, especially new employment situations where he will struggle to learn and remember new tasks." (Id. at 12, R. 371). Dr. Garner also opined that Cory does not appear capable of managing funds in his own best interest based on his own report, his performance on intelligence testing, and the report of his brother. (Id.).

On March 26, 2018, Cory returned to Dr. Wooden for a consultative mental evaluation. (Dkt. 16-7 at 24-26, R. 383-85). Cory's brother, Cary, who was also in attendance, reported that Cory has "some coordination issues as far as fine motor ability is concerned." (Id. at 24 R. 383). Dr. Wooden noted Cary's reports of Cory sometimes needing two hands to do something that most people could do with one hand, that Cory is very shaky with balance a lot of times, and that Cory cannot climb ladders or do heights. (Id. at 25, R. 384). Dr. Wooden acknowledged that Cory had been living in his own apartment within the same apartment complex as his brother, since November 2017. (Id.). Dr. Wooden noted that Cory was able to read a newspaper but had some difficulty with reading larger words; could perform basic

14

mathematical calculations; and reportedly required significant supervision and guidance when things out of the ordinary would need to be done. (Dkt. 16-7 at 25, R. 384). Dr. Wooden noted that Cory reported being able to organize and pay his own bills with assistance and guidance. (Id.) Dr. Wooden noted that Cory was unable to basically perform any calculations; that he struggled with making change; and that he had been cheated as far as making purchases in the past. (Id.). In view of the foregoing, Dr. Wooden opined that Cory would "definitely not be able to adequately handle his Social Security check independently." (Id.).

On examination, Dr. Wooden found that Cory was able to answer basic questions, his fine and gross motor control and ambulation were generally fairly good; and that Cory was generally lucid, logical, and coherent in a rather simplistic way. (Dkt. 16-7 at 25-26, R. 384-85). Dr. Wooden opined that Cory's immediate recall was very limited with significant difficulty; that his remote memory was generally good; that he had essentially no calculation skills; and that Cory functioned no higher than the borderline range of intellectual ability. (Id. at 26, R. 385). Dr. Wooden did not opine regarding claimant's ability to work.

Cory's brother provided a third-party report to the agency stating that he provided consistent reminders and support for Cory concerning personal care, house cleaning, and handling things out of the ordinary. (Dkt. 16-6 at 29-36, R. 289-96). While Cory testified at his disability hearing that he did not require a job coach or assistance with completing his previous duties at a local school, (Dkt. 16-2 at 53-54, R. 52-53), Cory's supervisor submitted a Work Activity Questionnaire which

provided that Cory did receive special assistance on the job – fewer or easier duties, irregular hours, and less hours – and worked under special conditions to complete his work. (Dkt. 16-6 at 91-92, R. 351-52).

Here, the ALJ found Dr. Esquerra's opinion not persuasive because Cory was able to shop, prepare meals, use public transportation, and care for his personal hygiene. (Dkt. 16-2 at 32, R. 31). The ALJ fails, however, to build a logical bridge for how those minimal activities undermined Dr. Esquerra's opinions about Cory's physical functioning or ability to work. There is no evidence using public transportation or preparing meals equates to the physical or mental activities Plaintiff would be expected to perform during a competitive, full-time job, which Dr. Esquerra opined Plaintiff would not be able to perform. By failing to properly assess Cory's activities of daily living by failing to consider the qualifications for how these activities are performed, the ALJ's reason for discrediting Dr. Esquerra's opinion is unpersuasive. Even though, the ALJ summarizes the psychological assessments by Dr. Wooden and Dr. Gardner of Cory, (Dkt. 16-2 at 30-31, R. 29-30), she did not give these opinions any specific evidentiary weight. (Id.). Finally, the ALJ did not explain whether she considered that Cory performed these daily activities on his own schedule, and with frequent breaks, and that he would not be afforded this flexibility in a competitive work environment. Because the ALJ's decision to reject Dr. Esquerra's opinion is not supported by substantial evidence in the record, remand is warranted on the issue of a proper analysis of Dr. Esquerra's opinion.

2.  *State Agency Psychologists Drs. Garcia and Horton*

Next, Cory explains that the ALJ's finding that the state agency psychologist's opinions were unpersuasive was correct. Cory then spends several pages explaining why this analysis is supported, and how it would have been improper for the ALJ to rely on the state agency's outdated, incomplete opinions. (Dkt. 18 at 17-18). The record demonstrates that the ALJ did not rely on the opinions of the state agency psychological consultations. (*See* Dkt. 16-2 at 31, R. 30 (finding "the opinion of the State Agency psychological consultants unpersuasive")). Thus, the Court need not address this argument.

## B. Step 3 Analysis for Listing 12.11

Cory next, argues that the ALJ committed reversible error when she failed to find the Plaintiff met Listing 12.11, which concerns neurodevelopmental disorders. (Dkt. 18 at 18-22). Specially, the Plaintiff maintains that the ALJ's finding that he had less than marked or extreme limitations in concentrating, persisting, or maintaining pace, and in adapting or managing oneself is unsupported.[3] The Commissioner responds that the ALJ's findings were supported by substantial evidence, and thus there is no error. (Dkt. 21 at 10-11).

Under Step Three of the sequential evaluation process, if a claimant has an impairment that meets or medically equals the criteria of an impairment found in

---

[3] In one conclusory sentence, Cory contends that "the evidence highlighted under Part A above shows that Plaintiff has at least a marked, if not extreme, limitation in understanding, remembering, and applying information" and moderate limitations in interacting with others. (Dkt. 18 at 20). This is not argument, and it is not for this Court to develop Plaintiff's argument or speculate as to possible arguments Plaintiff was attempting to make. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010); *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014).

the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumptively disabled and qualifies for benefits. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). The Listings specify the criteria for impairments that are considered presumptively disabling. *Minnick*, 775 F.3d at 935 (citing 20 C.F.R. § 404.1525(a)). A claimant may also demonstrate presumptive disability by showing that her impairments are accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* (citing 20 C.F.R. § 404.1526).

It is the claimant's burden to prove that his condition meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment with medical findings. *Minnick*, 775 F.3d at 935; *Sims*, 309 F.3d at 428; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Listing 12.11 has two sets of criteria, the A criteria, and the B criteria, which both must be met to meet the Listing. To be considered presumptively disabled under Listing 12.11, a claimant must show:

> A. Medical documentation of the requirements of paragraph 1, 2, or 3:
>    1. One or both of the following:
>       a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
>       b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or behaving as if being "driven by a motor").
>    2. Significant difficulties learning and using academic skills; or
>    3. Recurrent motor movement or vocalization.

AND

B. Extreme limitation of one, or marked limitation of two,[4] of the following
   areas of mental functioning:
   1. Understand, remember, or apply information.
   2. Interact with others.
   3. Concentrate, persist, or maintain pace.
   4. Adapt or manage oneself.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.11.

In this case, the ALJ found Cory's subjective statements and mental health records were inconsistent with a marked limitation in concentrating, persisting or maintaining pace[5] or in adapting or managing oneself.[6] (Dkt. 16-2 at 28, R. 27). Instead, the ALJ determined that only mild limitation were supported by the evidence. (Id.). To support this finding, the ALJ acknowledged statements from Cory and his family. (Dkt. 16-2 at 28, R. 27; Dkt. 16-6 at 29, 33, 37, 42, R. 289, 293, 297, 302; Dkt. 16-7 at 24-25, R. 383-84). The ALJ considered that Cory's enjoyment of reading and doing jigsaw puzzles would require him to focus and concentrate.

---

[4] A "marked" limitation exists when a claimant's ability to independently, appropriately, and effectively function on a sustained basis is seriously limited. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d). An "extreme" limitation exists when a claimant is not able to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

[5] Concentrating, persisting, or maintaining pace refers to the ability to focus on work activities and stay on task at a sustained rate. Examples include initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; and sustaining an ordinary routine and regular attendance at work. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(E)(3).

[6] Adapting or managing oneself refers to the ability to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include responding to demands, adapting to change; managing ones psychologically-based symptoms, distinguishing between acceptable and unacceptable work performance, setting realistic goals, making plans for oneself independently of others, maintaining personal hygiene and attire appropriate to a work setting, and being aware of normal hazards and taking appropriate precautions. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(E)(4).

(Dkt. 16-2 at 28, R. 27; Dkt. 16-7 at 25, R. 384). The ALJ also noted the findings of psychologist Dr. Gardner showing Cory was able to complete serial sevens, with only two errors. (Dkt. 16-2 at 28, R. 27; Dkt. 16-7 at 9, R. 368).

Further, in regards to adapting or managing oneself, the ALJ noted Cory's ability to live alone, cook meals, and perform household chores. (Dkt. 16-2 at 28, R. 27). The ALJ also considered that Cory had worked consistently throughout the relevant period, without evidence of excessive absences or difficulty managing his mood. (Dkt. 16-2 at 28, R. 27; Dkt. 16-7 at 25, R. 384). Finally, the ALJ acknowledged Cory's ability to track and attend his appointments. (Dkt. 16-2 at 28, R. 27; Dkt. 16-7 at 65, R. 424).

Cory provides multiple instances in the record and his own statements which he argues demonstrates "marked" mental limitations; he is essentially asking the Court to reweigh the evidence which the Court will not do. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (noting the court does not reweigh evidence in reviewing an ALJ's determination). Cory has failed to point to any evidence that discredits the ALJ's finding that Cory has mild limitations in concentration, persistence or pace or adapting and managing oneself. Accordingly, remand is not warranted on this issue.

### C. Residual Functional Capacity

Next, Cory asserts that the ALJ erred because she failed to identify an evidentiary basis that supported her RFC assessment. (Dkt. 18 at 23-31). The Seventh Circuit has defined the RFC as "the claimant's ability to do physical and

mental work activities on a regular and continuing basis despite limitations from [his] impairments." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). "A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1.

The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. *Id.* at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* An ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings), and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7.

Here, the ALJ found Cory has the available RFC to perform the full range of work at all exertional levels with the following non-exertional limitations: no fast-paced, production rate type work; occasionally interacting with coworkers, but no interaction with the public; and performing simple, routine, and repetitive tasks that are learned through demonstration rather than by written instructions. (Dkt. 16-2 at 29, R. 28).

The Plaintiff argues that it was improper for the ALJ to reach an RFC determination after she rejected all of the medical opinions. (Dkt. 18 at 24). Similar to the holding in *Matthew M.*, this Court will not endorse such a categorical rule. *See Matthew M. v. Kijakazi*, No. 4:20-cv-00239-JMS-DML, 2021 WL 5879068, at *7 (S.D. Ind. Dec. 13, 2021) (declining to endorse a rule that an ALJ who rejects all the medical opinions of record is automatically "playing doctor" in later reaching an RFC determination); *Simila v. Astrue*, 573 F.3d 503, 514-15 (7th Cir. 2009).

The question remains, however, once the ALJ discounted the opinions of Dr. Kiani, Dr. Esguerra, and the state agency psychological consultants, did she identify some basis in the record to support her RFC finding. *See Christine F. v. Saul*, No. 2:19-cv-359, 2020 WL 1673033, at *5 (N.D. Ind. Apr. 6, 2020) (finding an ALJ must identify some record basis to support her RFC assessment) (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011)). The ALJ's analysis is insufficient if she fails to link her RFC limitations to evidence in the record providing the necessary logical bridge from the evidence to the RFC's limitations. *Phillips v. Berryhill*, No. 17 C 4509, 2018 WL 4404665, at *3 (N.D. Ill. Sept. 17, 2018).

By finding the state agency consultants and Cory's treating physician's opinion unpersuasive, all that remained of the record were the reports of Drs. Wooden and Gardner, which, as previously discussed, the ALJ summarized but did not give any weight, (Dkts. 16-2 at 31, R. 30; 16-7 at 3-15, 24-26, R. 362-74, 383-85); the claimant's subjective symptoms which the ALJ discredited, (Dkt. 16-2 at 32-33, R.

31-32); treatment notes for bronchitis, pneumonia, and annual visits, (Dkt. 16-7 at 17-20, 48-54, 56-61, R. 376-79, 407-13, 415-420); a document from Indianapolis Public Schools, (Dkt. 16-7 at 21-22, R. 380-81); bloodwork from Greene County General Hospital, (Dkt. 16-7 at 32-47, R. 391-406); an intake form from Centerstone of Indiana that deferred diagnosis, (Dkt. 16-7 at 62-68, R. 421-27); an eye examination showing 20/20 vision in both eyes with correction, (Dkt. 16-7 at 28, R. 387); normal hearing test, (Id.); and the Work Activity Questionnaire related to Cory's job as a custodian, (Dkt. 16-6 at 91-92, R. 351-52). With the exception of Drs. Wooden and Gardner's opinions, which were not weighed, none of these sources appear to provide support for the ALJ's RFC determination.

While the Court recognizes that the determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – she failed to support her functional capacity findings with the remaining evidence from the record. Despite medical opinions to the contrary, the ALJ concluded based on her reading of the medical evidence and her assessment of Cory's testimony that the Plaintiff could perform competitive work at all exertional levels. (Dkt. 18 at 24). Without the medical opinions of Drs. Kiani and Esguerra, the ALJ was left with a record that lacked any record evidence assessing Cory's functional abilities based on his mental and physical limitations causing the ALJ to improperly play doctor and fill in these evidentiary gaps with her own lay opinion. This was error. *Walton v. Berryhill*, No. 1:17-cv-00763-RLY-TAB, 2017 WL 6015807, at *3-4 (S.D. Ind. Nov. 14, 2017) (concluding that ALJ erred in incorporating some functional limitations

similar to reviewing physicians' opinions and adopting other less restrictive limitations with "no basis in the record.").

As noted above, the ALJ rejected the opinions of Dr. Kiani, the examining consultant, and Dr. Esguerra, the treating physician, concerning Cory's need for limitations on walking, lifting, and carrying. The ALJ reasoned that their opinions were unsupported by the record and their own treatment notes which recorded normal physical findings for Cory. (Dkt. 16-2 at 31-32, R. 30-31). The ALJ also rejected the RFC determination of the reviewing psychological consultants finding their opinions did not account for all of Plaintiff's mental restrictions, and that Plaintiff was more limited than the state agency psychologists found. The Court does not find that the ALJ should have given evidentiary weight to any of the opinions; however, she was left with an evidentiary record that did not support her RFC determination. *Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir. 2010) (when the ALJ rejects all physician opinion evidence, an evidentiary deficit exists); *McDavid v. Colvin*, No. 15 C 8829, 2017 WL 902877, at *5 (N.D. Ill. Mar. 7, 2017) (finding that where the ALJ discounted the only medical opinions that set forth RFC determinations, "she was left with an evidentiary record that did not support her RFC determination"); *Daniels v. Astrue*, 854 F. Supp. 2d 513, 523 (N.D. Ill. Apr. 2, 2012) (finding remand necessary due to evidentiary deficit where ALJ rejected opinion of treating physician and did not mention or evaluate the only other medical opinions).

During Dr. Gardner's psychological examination of Cory, she noted that Cory needed directions read to him two to three times on several subsets before understanding what was being asked of him. (Dkt. 16-7 at 6, 11, R. 365, 370). Dr. Gardner concluded that Cory's ability to sustain attention, concentration, and exert mental control is in the borderline range. (Id. at 11, R. 370). When compared to his peers, Dr. Gardner found Cory's ability to process simple or routine visual material without making errors in the extremely low range. (Id.) Cory's ability to listen to oral information, repeat it immediately, and then recall the information after a delay was average, but his memory of visual details and spatial location was lower than expected. (Id. 11-12). Dr. Gardner reasoned that Cory's visual memory would "likely…be a great disadvantage for him in all aspects of daily living, especially new employment situations where he will struggle to learn and remember new tasks." (Id. at 12, R. 71). Dr. Garner relying on Cory's memory impairment, in conjunction with his aphasia and poor executive functioning, diagnosed him with dementia. (Id.).[7] Dr. Gardner also found Cory incapable of managing funds in his own best interest. (Id.). While the ALJ acknowledges certain aspects of Dr. Gardner's report, (Dkt. 16-2 at 28, R. 27), the ALJ fails to explain the effects of Cory's mental impairments on his RFC. Without this explanation, it is impossible for the Court to determine whether the RFC analysis includes all of Cory's mental limitations supported by the record.

---

[7] Dr. Garner noted that the exact etiology of the dementia was unclear. (Dkt. 16-7 at 12, R. 371).

Without a record basis to support the RFC finding, the ALJ's analysis fails to build an accurate and logical bridge from the evidence to the RFC's limitations.[8] Thus, the Court finds that remand is necessary due to the evidentiary deficit created by the ALJ's rejection of Cory's available medical opinions. On remand, the ALJ may obtain an updated medical opinion as to Cory's functional capabilities and reassess Cory's subjective symptom allegations.

## V.   CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration. Final judgment will issue accordingly.

So ORDERED.

Date: 3/18/2022

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

---

[8] Because the Court remands on these bases, it need not address Plaintiff's other arguments at this time.